# AMERICAN ARBITRATION ASSOCIATION

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

---

ICDR CASE NO. 01-19-0003-1166

In the Matter of the Arbitration between:

NIKOLAY RASTORGUEV

      Claimant,

and

DAVID SEPIACHVILI, DAVID A. SEPIASHVILI, ATERRA EXPLORATION, LLC, SOUTHTEX ENERGY CORPORATION, LEVEL ONE ADVISORS, INC., AND TIGHT ROCK COMPANY, LLC

      Respondents.

---

## FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration clause of the Special Purpose Loan Agreement dated December 3, 2015 and the Arbitration Agreement dated September 27, 2019 entered into between the above-named parties as fully described below, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

## I.  THE PARTIES

Pursuant to the Commercial Arbitration Rules of the American Arbitration Association (the "AAA"), Nikolay Rastorguev ("Claimant" herein) filed his Seconded Amended Statement of Claim (the "Claimant's Statement of Claim"); and David Sepiachvili and David A. Sepiashvili

(together, the "Individual Respondents"), and Aterra Exploration, LLC ("Aterra"), SouthTex Energy Corp. ("SouthTex"), Level One Advisors, Inc. ("Level One"), and Tight Rock Company, LLC ("Tight Rock") (together, the "Corporate Respondents"), and, collectively for all of them, the "Respondents," filed "Respondents' Answer and Counterclaim." Claimant and Respondents are sometimes referred to herein as a "Party" or, collectively, as the "Parties."

The disputes and issues to be resolved in this arbitration arise under a contract dated December 3, 2015, between Respondent Aterra and Claimant, and which is entitled "Special Purpose Loan Agreement" (the "SPLA" herein).

Based on the evidence and applicable law presented in this case in filings and at the hearings, I, the Arbitrator, having been designated in accordance with the Arbitration Agreement entered into between the Parties and dated September 27, 2019, and having duly heard the proofs and allegations of the Parties, do hereby find and Award as follows: (a) Claimant is awarded, and the Respondents, other than Level One, are jointly and severally liable to Claimant for, the amount of $1,835,000 for Claimant's causes of action based on breach of contract, fraud, breach of fiduciary duty, and attorney's fees, less a set off of $96,512 awarded to the Respondents for their Counterclaims for their attorneys' fees in the Federal Action; which results in a net Award of $1,738,488; and (b) Claimant is also awarded post-judgement interest effective from and after June 1, 2020, on the unpaid part of such net amount of $1,738,488 at four percent (4%) per annum, not compounded, until paid.

## II.  FINDINGS OF FACT

In the course of their respective filings and in the hearings, the Parties have acknowledged or asserted facts relating to determining the basis for the above Award, including, without limitation, the following:

1. The Individual Respondents are cousins whose families immigrated together in the early part of the 1990's to the United States in the New York City area from Georgia. The Individual Respondents successfully completed their educations through college to earn, for Respondent Sepiachvili, an Engineering degree from a college in the City of Minsk, the Republic of Belarus, and, for Respondent Sepiashvili, a B.A. in Mathematics from New York University, and Masters and Doctorate degrees in Electrical Engineering from Carnegie Mellon University. (Exhibit C-9).

2. The Individual Respondents eventually worked together organizing and developing oil and gas prospects in the Williston Basin in North and South Dakota, where Claimant was one of the investors in 2012 for about $3,000,000. (Exhibit R-14). Subsequently, the Individual Respondents moved their organizing of oil and gas exploration and development operations to the Frio County area in central south Texas.

3.  Respondent Aterra was organized initially under a different name in 2006 (Exhibit R-1), was owned by Respondent Sepiachvili and Adyl Khidirbekov (Exhibit R-41), and, presumably, contracted for the acquisition of oil and gas leases for the drilling of wells by others in the Eagle Ford field area of Frio County, Texas. (Exhibit R-6).

4. Respondent Tight Rock was organized in Texas in January 2012 (Exhibit R-5), was operated by Respondent Sepiashvili (Respondents' Pre-Hearing Brief, paragraph 3),

and primarily acquired oil and gas leases with contract land men for Respondent
Aterra to contract with producers or investors for drilling operations. (Exhibit R-6).
The other Corporate Respondents were owned wholly or in part by one or both of the
Individual Respondents.

5. None of the Corporate Respondents owned nor operated drilling, exploration, or
operating facilities or equipment, nor did they have many, if any, employees other
than the Individual Respondents (Exhibit R-37, Section 6.1.A). Instead, they relied on
independent contractors to handle such operations. (Exhibit R-37, Section 6.1.A).
Hence, the Corporate Respondents' assets consisted primarily of bank accounts.

6. Prior to September 2015, Respondents and Claimant discussed entering into a joint
venture form of agreement to cover an exploration venture in the Eagle Ford field
area (Exhibit C-9), but in September 2015, prior to executing a negotiated draft of it,
the Parties revised it at the request of Claimant. The revisions, including entitling it a
"Loan Agreement," were made for the purpose of better allowing Claimant to comply
with Russian tax law, but apparently had no intended and purposeful change under
Texas law. (Exhibit R-14).

7. On or about December 3, 2015, Respondent Aterra and Claimant executed the SPLA,
as revised to contain some provisions evidencing a Loan Agreement to meet Russian
tax laws. (Exhibit R-37).

8. On or about September 25, 2015, and during the SPLA negotiations, Respondent
Tight Rock obtained an oil and gas lease (the "Marion Lease," or the "Lease") from
Nancy Marion for $464,000. (Exhibit R-26 (b)). The Lease had a three year primary
term for the commencement of drilling operations or the sale of the Lease to a third

party who would need to commence such operations. The Lease also contained a right to extend it for two additional years for a payment of $500 per acre for 1160 acres, or about $580,000. (Exhibit R-26(b)), Section 2).

9. On or about September 24 and December 11, 2015, the Individual Respondents caused Respondent Aterra to pay Respondent Tight Rock in two payments a total of $1,800,000 for the assignment of the Marion Lease to Respondent Aterra. (Exhibit R-16).

10. On or about December 6, 2015, Claimant paid $1,800,000 to Respondent Aterra under the SPLA to cover the cost of the Marion Lease purchased by Respondent Aterra from Respondent Tight Rock for $1,800,000. (Exhibit R-38).

11. Prior to the execution of the SPLA on December 3, 2015, Claimant was not advised of the existence of Tight Rock or: (a) that Respondent Tight Rock was owned by one of the Individual Respondents, (b) that the Marion Lease had recently been acquired by Respondent Tight Rock from Nancy Marion for $464,000, or (c) of the intermediary role of the Individual Respondents in causing Respondent Tight Rock to acquire the Lease from Nancy Marion for $464,000 for its transfer for $1,800,000 to Respondent Aterra. (C-2, 3, and 6; and R-26B and 26A).

12. No drilling under, or sale of, the Lease was made by Respondents relative to, and during the primary term of, the Marion Lease, and, therefore, neither was a sale or development of it made during the eighteen months period required in the SPLA at Sections 2.4 and 4.2. Further the $580,000 payment was not made in accordance with Section 2 of the Lease to extend its term, and it expired in or about September 2018.

Respondent Aterra made efforts to sell the Lease, but was unable to do so. (Exhibits R-47, 48, and 50).

13. The SPLA (Exhibit R-37) defines the rights and obligations of Claimant and Respondent Aterra under it. Some of its principal provisions **(with Emphasis added)** are as follows:

   a. In its "Recitals:" (i) "Aterra individually **and jointly with its affiliates**, …, **agents** … possesses the requisite knowledge, skill and expertise for… **acquisition of** oil and gas leases … in the Eagle Ford trend …"; (ii) "Aterra has **identified** an oil and gas lease …"; (iii) "Aterra **desires to acquire** the Lease…**price of $1500 per acre** …;" (iv) "Creditor possesses the funds …of $1,800,000 … **required to acquire** the Lease …"; and (v) "Creditor agreed to provide … $1,800,000 … **for the acquisition of Lease** …"

   b. In parts of its "Articles II, III, and IV": (i) "Section 2.2 … The Funds are provided … **for the acquisition** … of the Lease … and … per acre price of $1,500 …;" and (ii) "Aterra shall provide the Creditor **with the possibility to ensure** that the Funds are used **for the purposes specified above**. **This Loan is ensured and guaranteed by the Lease itself only."** This sentence was added at the request of Claimant "as a formality" to satisfy the Russian tax laws, and Respondents also considered it to be a "formality up until Claimant sent a demand letter on the Loan…" However, at that time and without any amendment to the SPLA, Respondents assert, such action "converted the non-recourse term to a substantive and enforceable provision of the SPLA," (TR Day 3, Testimony of David Sepiachvili, at 72:12-19).

c.  Sections 2.3, 2.4, and 4.1, in part, provide three possible forms of consideration for Claimant, two of which were operative if Respondent Aterra sold or developed the Lease; neither of which occurred. That brought into play the third form of consideration under Section 4.1.A. Hence, clauses "B" and "C" of each of Sections 2.3, 2.4, and 4.1 became inoperative; however, clauses "A" in each of Sections 2.3, 2.4, and 4.1 remained operative. These clauses "A" provide: in Section 2.3, for the payment of interest; in Section 2.4, for the "Effective Period" to expire after 18 months; and in Section 4.1, **"In case of expiration of the Effective Period due to the event specified in Point A of Section 2.4 (expiration of 18 months period), Aterra shall REPAY TO THE BANK ACCOUNT OF THE CREDITOR THE FUNDS plus Interest within 15 … days after the last date of the Effective Period."** Aterra did not pay to Claimant any of such "Funds," which are defined as the $1,800,000 initially paid to Respondent Aterra by Claimant.

d.  The sentence at the end of Section 2.2, hereinabove quoted, regarding the Loan only being ensured and guaranteed by the Lease may, or may not, be considered to be in conflict with the language in Section 4.1.A; however, it is difficult to give meaning to both sentences. Neither of these contractual provisions is made subject or subordinate to the other, although the language in clause "A" of Section 4.1 is the more definitive of the two sentences and is more clearly drafted to be understandable in meaning. Of course, if the Lease were not developed or sold before its expiration (which it was not), or before the expiration of 18 months under Section 4.1.A, and if Respondent Aterra has

no liability to Claimant in any circumstance under the operation of such last sentence of Section 2.2 (which Respondents claim), then the wording in Point A of Section 4.1 of the SPLA seems to be left without meaning in any circumstance. Under Respondents' reading of the SPLA, Respondents could collect the $1,800,000 from Claimant, pay Nancy Marion $464,000 for the Lease, do nothing to sell or develop the Lease in breach of the SPLA or fraudulently, and keep the balance with impunity (See Breach of Contract position of Respondents stated below).

e.  In parts of its Article III, Acquisition of the Lease, Obligations of Aterra: (i) Section 3.1 … "Aterra shall acquire the Lease … an agreed upon price of $1500 … per acre … "Aterra, as the Manager of the Prospect, **shall successfully sell or develop the Prospect ON A BEST EFFORTS BASIS** within 18 … months from the date of this Agreement;" and (ii) Section 3.3 Management of the Prospect". … **Aterra, as the Manager of the Prospect, shall PROVIDE EXPERTISE IN MANAGING THE PROSPECT ON BEST EFFORTS BASIS to successfully sell or develop the Prospect. The Manager SHALL NOT ENGAGE IN ANY ACTIVITY that would be FINANCIALLY HARMFUL to the Prospect."**

f.  In parts of Article VII, Termination of the Agreement, Section 7.2, Failure to comply with the Agreement, the SPLA provides: "In the case **ATERRA fails to comply with** any of its obligations procured in the **Agreement** the Creditor may immediately after such failure claim the **payment of the Funds, Interest, and** …." Such "Funds" were never paid to Claimant.

g.  In parts of Article IX, General Provisions: (i) Section 9.1, Individual activities of the Parties, provides, after acknowledging the right of a Party to conduct business with others, that "provided that **no Party shall** participate in any activity **as an individual or jointly with others where such participation would be contrary to the purposes of activities under or in violation of this Agreement**;" (ii) in "Section 9.8, Amendments and waivers. **Any provision of the Agreement may be amended or waived if, but only, if such amendment or waiver is in writing and is signed by all of the Parties hereto;"** (iii) in "Section 9.15. Disclaimer of warranties; **Other than those expressly set out in this Agreement,** ATERRA expressly disclaims any and all representations or warranties …and Creditor agrees that the Lease shall be deemed "where is" and "as is" with all faults …;" and (iv) in parts of "Section 9.16. Knowledgeable Investor. Each …Party to this Agreement are knowledgeable investors , has the ability to evaluate … Each and every party has relied on its own independent due diligence investigation of the transaction and has been advised by and relied solely on its own expertise and legal, land, tax, …concerning this transaction and the value thereof …"

14. In January 2017, Respondent Aterra proposed to Claimant that Respondent Aterra assign the Lease to Claimant or that Claimant invest more funds into selling or developing the Lease. (Exhibit R-53).

15. On or about August 2 and 7, 2017, Respondent Aterra signed and transmitted to Claimant's lawyer certain "Settlement Documents" that would give Claimant the opportunity to sell the Marion Lease. Claimant did not sign such documents but made

9

some efforts to sell the Marion Lease with no success. (R's Pre-Hearing Brief, paragraphs 12-14).

16. On or about August 2, 2017: Respondent Aterra resigned as Director of Respondent SouthTex (Exhibit R-65); Respondent Aterra assigned the Lease to Respondent SouthTex (Exhibits R-66 and 68); Respondent Aterra assigned the SPLA to Respondent SouthTex (Exhibit R-67); and Respondent Aterra assigned its 50% stock ownership in Respondent SouthTex to Respondent SouthTex. (Exhibit R-69).

17. Respondents presented their evidence of seven sales of leases comparable, Respondents assert, to the Marion Lease, which occurred during the period from June 2012 to December 2017 (Exhibits R-89 and R-91-95); however, Respondents failed definitively to take into account existing production described in such Exhibits for some or all of such leases for comparison with the Marion Lease, which appeared to have no producing, proven, or established recoverable reserves. Respondents also failed definitively to explain other geological, proven reserves, or acquisition pricing distinctions for each "comparable" to the Lease to explain why Respondents could not find a buyer for the Marion Lease, or to explain why Respondents did not commence drilling operations on the Marion Lease during its primary term, or to explain why it did not pay the $580,000 to Nancy Marion to extend the Lease for two years and, then, to sell or develop it if, in fact, the Lease was at or greater in fair market value than $1500 per acre, as each comparable asserts to be. (Exhibits R-89, R-91-95).

18. All or most of the Corporate Respondents, including Respondent Aterra, had little or no assets or operations at the hearings dates. (Tr. Vol. 3, Respondent Sepiachvili at

page 149).  Level One has not been involved in the facts and allegations relating to the causes of action successfully asserted in this arbitration.

19. In Respondent Aterra, Respondent Sepiachvili owned 40% and operated it.  Adyl Khidirbekov owned the other 60% until he sold some of it (Exhibit R-41) and then totally withdrew from Respondent Aterra in November 1, 2016 (Exhibit R-51).  In Respondent Tight Rock, Respondent Sepiashvili was an owner and operated it. He also assisted Respondent Aterra by providing accounting and consulting services, by maintaining its computer address for emails, by assisting it in a meeting with Claimant before the SPLA was signed, and in other day-to-day matters (C-8, C-9).

20. Claimant filed a lawsuit (the "Federal Action") against Respondents in the United States District Court, Western District of Texas, San Antonio Division, for damages or other relief based, in part, on the claims of Claimant in this arbitration. (Exhibit R-80). Respondents filed a Motion to Compel Arbitration and to Stay Litigation (Exhibit R-77), which was granted February 14, 2019. (Exhibit R-79).  At the direction of the Court, the Parties entered into an Arbitration Agreement dated September 27, 2019 (the "Arbitration Agreement"). (Exhibit R-80). It provides, among other directives, for an arbitration proceeding administered by the AAA on matters relating to the SPLA, but excluding other disputes between them in such lawsuit.

**CLAIMANT'S CAUSES OF ACTION**

Claimant asserts the following causes of action in Claimant's Statement of Claim; Respondents' reply to them; and the Arbitrator rules on them, as follows:

1. **Violations of Section 10(b) of the Exchange Act and Rule 10b-5.**

   a. Claimant asserts that: (i) the SPLA is a "security" or "securities transaction" which is covered by these federal law statutes, rules, and related cases; (ii) the U.S. Supreme Court has given flexible tests for determining whether an investment contract qualifies as a security; and (iii) the Supreme Court called into doubt nonrecourse loans not being securities by recognizing the "family resemblance" test, with a presumption of "any note" being a security.

   b. Respondents assert that the SPLA did not involve a security because: (i) it was a nonrecourse loan, which loans do not qualify as securities transactions; (ii) the SPLA and/or the Marion Lease is not the type of "note" that courts recognize as falling under the Exchange Act's definition of a security because of the one-on-one business negotiations in a complicated "tailor made" sales agreement; and (iii) the SPLA is not the type of note that courts recognize under the "family resemblance" test or the "Howey" test as falling under the Exchange Act's definition of "security."

   c. The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that: (i) neither the SPLA nor the Marion Lease is the type of "note," nor is either of them a "security," that courts recognize as falling under the Exchange Act's jurisdiction; and (ii) the facts, evidence, and law presented in this arbitration do not support this cause of action offered by Claimant for the recovery of damages by him from any of the Respondents.

2. **Violations of Section 20(a) of the Exchange Act against Sepiachvili and David A. Sepiashvili.**

   a. Claimant asserts that this Act covers those who control a "person" liable under this Act, so that the Individual Respondents would be liable for the acts of the Corporate Respondents.

   b. Respondents assert that since the SPLA did not involve the sale or purchase of a security, none of the Respondents could have committed a violation of Section 10 or Rule 10b-5.

   c. The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that: (i) the facts, evidence, and law presented in this arbitration do not support this cause of action offered by Claimant for the recovery of damages by him from any of the Respondents; and (ii) the Respondents' assertions are substantially correct.

3. **Fraud and Fraudulent Inducement.**

   a. Claimant asserts that: (i) the elements of fraud are that a material false representation was knowingly or recklessly made by a speaker with the intent the other party would act on it, which occurred in this case; (ii) both of the Individual Respondents, for all Respondents, knowingly or recklessly made false material misrepresentations to Claimant in or regarding the SPLA; (iii) such false material misrepresentations are contained in the SPLA and other communications, written and oral, regarding, among other matters, using and advising Claimant of the purchase price of $1,800,000, rather than the $464,000 initially paid to Nancy Marion for the Lease,  (iv) Respondents also committed fraud by nondisclosure

by failing to advise Claimant of the existence of Respondent Tight Rock, its relation to other Respondents, or the intermediary role of Tight Rock; (v) these fraudulent misrepresentations and nondisclosures caused Claimant's justifiable reliance and damages; and (vi) Claimant's recovery of damages should be sufficient to keep him whole as if he had not entered into the transaction.

b. Respondents assert that: (i) Respondents did not commit fraud against Claimant when Respondent Aterra paid Respondent Tight Rock $1,800,000 for the Lease even though Respondent Tight Rock bought it for $464,000 from Nancy Marion a few weeks earlier because the transactions were consistent with industry practice (TR Day 4, Larry Moroz); (ii) Respondents could not "have committed fraud, as Claimant got what he bargained for when Respondent Aterra tendered the Lease" near the end of its primary term. (Rs' Pre-Hearing Brief, paragraph 28); (iii) the amount of $1,800,000 paid by Respondent Aterra to Tight Rock, not the $464,000 paid by Respondent Tight Rock to Nancy Marion, was the "fair market value" of the Lease (R's Pre-Hearing Brief, Par, 30; TR Day 4, Mark Prywara); (iv) Claimant's fraud claim fails as a matter of law because he did not prove justifiable reliance, (v) the SPLA was an arms' length transaction and, further, recites that Claimant relied on his own due diligence pursuant to its Section 9.16 in entering into the SPLA; and (vi) Claimant had indisputable constructive notice from the official property records of Frio County of the Lease that Nancy Marion signed with Tight Rock prior to the execution of the SPLA.

c. The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that: (i) Respondents assertion of the indisputable constructive

notice by Claimant from the filing of the Lease purchased by Respondent Tight Rock from Nancy Marion is not well taken since, among other reasons stated in this Award, Claimant had no knowledge, and no reason to have knowledge, of Respondent Tight Rock; further, the filing had no dollar amount stated in it; (ii) the Individual Respondents and Corporate Respondents owed a duty not to assist, participate in, or cause, Respondent Aterra in its failing to exercise "best efforts" under the SPLA; and a duty not to defraud Claimant when they caused Respondent Aterra to breach its duties to Claimant under the SPLA; (iii)  those "best" efforts" included using the "best efforts" set forth in the SPLA to "acquire" and "manage" the Lease; and to "successfully sell or develop the Prospect on a best efforts basis within the 18 … months from the date of this Agreement;" and to "provide expertise in managing the Prospect on a best efforts basis to successfully sell or develop the Prospect;" and to "not engage in any activity that would be financially harmful to the Prospect;" (iv) additionally, the Individual and Corporate Respondents caused Respondent Aterra to breach its "best efforts" duty under Section 4.1.A of the SPLA, where it provides "in the case  of expiration of the Effective Period due to… expiration of the 18 … months period …" to "repay the bank account of the Creditor the Funds plus Interest within 15 (fifteen) days after the last date of the Effective Period;" (v) Respondents breached, or participated in breaching, those contractual duties in a fraud on Claimant, and those duties show a basis for justifiable reliance by Claimant; (vi) the last sentence of Section 2.2, which may be read to reduce Respondent Aterra's liability to Claimant, cannot do so with the breaches of the SPLA and the fraud set

forth in this Award (See Findings of Fact); and (vii) the Claimant's assertions above are substantially correct.

4. **Theft.**

   a. Claimant asserts that: (i) the Respondents unlawfully appropriated his funds without his "effective" consent and with the intent to deprive him of them; and (ii) all Respondents receiving funds knew they were stolen.

   b. Respondents assert that: (i) the SPLA is a nonrecourse loan which Respondent Aterra fully performed under its terms; (ii) Claimants recourse and damages are limited to the Marion Lease under Section 2.2; (iii) Claimant gave his express consent to use his funds to purchase the Lease; and (iv) Respondents tendered the Lease to Claimant in the "Settlement Documents" to comply with Section 2.2.

   c. The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that the facts, evidence, and law presented in this arbitration do not support this cause of action offered by Claimant for the recovery of damages by him from any of the Respondents.

5. **Breach of Fiduciary Duty.**

   a. Claimant asserts that: (i) the SPLA is a joint venture agreement, which results in a fiduciary duty of "utmost good faith and scrupulous honesty" owed by Respondents Aterra and Sepiachvili to Claimant, (ii) as joint adventurers, Respondents Aterra and Sepachvili, together with the participation and assistance of Respondents SouthTex, Sepiashvili, and Tight Rock, breached the fiduciary duty and caused Claimant's damages by the failure to make good faith disclosures of the purchase price of the Lease of $464,000 by Respondent Tight Rock from

Nancy Marion; (iii) Respondents only disclosed the inflated purchase price paid by Respondent Aterra to Respondent Tight Rock of $1,800,000, and did not disclose the $464,000 paid by Tight Rock to Nancy Marion for the Lease, (iv) Respondents did not disclose the related dealings between the Individual Respondents with each other, and between them and the Corporate Respondents; and (iv) when Respondent Sepiachvili stated that he never intended to pay back the loan investment by Claimant, he acknowledged the SPLA was not a loan instrument but was a joint venture (R-35; V3 159:17-160; V3 162-10-12)**.**

b.  Respondents assert that: (i) the SPLA is not an organizational document, but is a commercial document, in which a fiduciary or special relationship of trust and confidence could not exist; and (ii) the fiduciary duties, if any existed in the Williston Basin transaction, did not transfer to fiduciary duties or a duty to disclose in or under the SPLA.

c.  The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that: (i) the SPLA was drafted from, and in the nature of, a joint venture agreement, although named a "Loan Agreement" and containing some formalistic and substantive rights and obligations of a loan arrangement at the request of Claimant for Russian tax purposes; (ii) the loan provisions of the SPLA would only be operative if neither a sale or development of the Marion Lease occurred, which did not occur. (iii) the SPLA also contains provisions applicable before a sale or development of the Lease which are typically found in a joint venture agreement; (iv) these joint venture provisions were operative at the execution of the SPLA in order to effect a sale of the Lease or to initiate drilling

operations for development of the acreage committed to the Lease; (v) these joint venture provisions were also operative near the end of operations under the SPLA as Respondents' land man, Danny Davis, asserted to have an offer of purchase for the Lease of about $500,000 from a potential purchaser as contemplated in Paragraphs "B" of Sections 2.3, 2.4, and 4.1. (Respondents' Post-Hearing Brief, Par. 39); (vi) accordingly, Section 2.2 and the other loan provisions of the SPLA were not viewed by the Parties in executing the Lease as establishing a substantive loan or nonrecourse loan instrument, but were considered to be "formalistic" by them for Russian tax purposes; (vii) the joint venture provisions of the SPLA could not be "converted" or "waived" to a loan agreement without amendment of the SPLA pursuant to its Section 9.8; (viii) in effect, the provisions of Section 4.1.A were default provisions in place if a sale or development could not be achieved; (ix) hence, the Arbitrator finds that the SPLA was intended by the Parties from its execution to form a joint venture, and it was not drafted by the Parties to be a loan agreement by the changes made at the request of Claimant to allow him to better deal with the tax authorities in Russia, nor was the SPLA subsequently somehow converted to be a loan agreement by the actions or course of conduct of Claimant in demanding payment under its Section 4.1.A; and (x) the assertions by Claimant are substantially correct.

6. **Breach of Contract.**

   a. Claimant asserts that: (i) the SPLA was a valid contract performed by Claimant but breached by Respondent Aterra, which resulted in damages to Claimant; (ii) Respondent Aterra failed, among other listed breaches of the SPLA, to pay to

Claimant the "$1,800,000 plus Interest" provided for in Section 4.1.A of the SPLA (Exhibit C-5, Response to Question No. 38); and (iii) Claimant's damages are measured by the amount by which the purchase price was exceeded by any amount received for its sale, or $1,800,000.

b.  Respondents assert that: (i) the SPLA is a nonrecourse loan which Respondents fully performed under its terms; (ii) without any amendment, Section 2.2 of the SPLA "evolved over time to constitute more than a formality. It became a substantive term at the time Claimant demanded repayment of the Loan and filed the Federal Action;" (iii) Claimants recourse and damages are limited to the Marion Lease under Section 2.2; (iv) Respondents tendered the Lease to Claimant in the "Settlement Documents" to comply with Section 2.2; (v) no claim for damages under the SPLA can stand for "**any default** (Emphasis added) by Aterra" because the last sentence of Section 2.2 of the SPLA limits Claimant's remedies by stating the "Loan is ensured and guaranteed by the Lease itself only."

c.  The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that: (i) the SPLA is not a nonrecourse loan; (ii) its Sections 4.1.A and 7.2 provide recourse against Respondent Aterra, as well as against the other Respondents for their fraud, assistance, and participation in violating said Sections 4.1.A and 7.2; (iii) Claimant can recover $1,800,000 from Respondent Aterra under Sections 4.1.A and 7.2 of the SPLA; Section 4.1.A provides, in part: "in the case of expiration of the Effective Period … the 18 … months period …," then Respondent Aterra shall "repay the bank account of the Creditor the Funds," or $1,800,000, "plus Interest within 15 (fifteen) days after the last date of the

Effective Period;" (iv) Respondent Aterra, with the assistance, participation, fraud, and direction of the other Respondents, breached other of Respondent Aterra's duties to Claimant under the SPLA by "failing to sell or develop the Prospect on a best efforts basis within the 18 … months from the date of this Agreement," and "failing to provide expertise in managing the Prospect on a best efforts basis to successfully sell or develop the Prospect," and "failing to not engage in any activity that would be financially harmful to the Prospect;" and by failing to use "best efforts" to acquire the Lease for the $464,000 paid to Nancy Marion instead of the $1,800,000 paid to Respondent Tight Rock to purchase the Lease and, also, to fulfill other obligations contained in the SPLA so long as the $1,800,000 lasted; (v) the contractual duty under the SPLA to exercise "best efforts" under Texas law was not briefed by the Parties, but at a minimum it would seem to mean an ordinary covenant to perform, and at a maximum would seem to mean a higher duty to perform, as has been found in at least one other State; and (vi) Claimant is not entitled to recover the "Interest" part of Section 4.1.A because of the unwarranted delays caused by him in the resolution of this case by filing a federal lawsuit in breach of the mediation and arbitration provisions in Article VIII, Conflict Resolution, of the SPLA, and by taking and attempting to sell the Marion Lease when that was the primary responsibility of the Respondent Aterra.

7. **Civil Conspiracy.**

   a. Claimant asserts that: (i) this cause of action requires a combination of two or more persons seeking jointly to accomplish unlawful acts in pursuance of a course

of action, and resulting damages; (ii) Respondents sought by overt acts and specific intent to unlawfully take all or a part of Claimant's $1,800,000 for Respondents use and benefit; and (iii) Respondents were aware of their intended harm and resulting damages to Claimant.

b. Respondents assert that: (i) the SPLA is a nonrecourse loan which Respondents fully performed under its terms; (ii) Claimants recourse and damages are limited to the Marion Lease under Section 2.2; and (iii) Respondents tendered the Lease to Claimant in the Settlement Documents to comply with Section 2.2.

c. The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that the facts, evidence, and law presented in this arbitration do not support this cause of action offered by Claimant for the recovery of damages by him from any of the Respondents.

8. **Respondeat Superior/Vice Principal Liability.**

a. Claimant asserts that: (i) an agency or employer-employee relationship existed between the Individual and Corporate Respondents, and the Individual Respondents committed a tort in the course of and scope of their authority and the business of the Corporate Respondents; and (ii) each of the Individual Respondents had the status as a vice-principal to impute liability for their actions taken even though the Corporate Respondents were not negligent.

b. Respondents assert that: (i) the SPLA is a nonrecourse loan which Respondents fully performed under its terms; (ii) Claimants recourse and damages are limited to the Marion Lease under Section 2.2; (iii) Respondents tendered the Lease to Claimant in the "Settlement Documents" to comply with

Section 2.2; and (iv) Respondent Sepiashvili is not an employee of Respondent Aterra.

c.   The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that the facts, evidence, and law presented in this arbitration do not support this cause of action offered by Claimant for the recovery of damages by him from any of the Respondents.

9.   **Negligence.**

a.   Claimant asserts that Respondents had a legal duty to prevent the expiry of the Lease and were negligent in failing to prevent such expiry, resulting in damages to Claimant**.**

b.   Respondents assert that: (i) they had no duty to extend the lease; and (ii) they were in no position to do so since they had delivered the "Settlement Documents' to Claimant, who was then in control of the SPLA and the Lease.

c.   The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that the facts, evidence, and law presented in this arbitration do not support this cause of action offered by Claimant for the recovery of damages by him from any of the Respondents.

10. **Gross Negligence.**

a.   Claimant asserts that Respondents' conduct caused an extreme degree of risk of which they were aware, but they proceeded with conscious indifference and a likelihood of serious damages to the rights or welfare of Claimant.

b.   Respondents assert that it is not liable for a claim of gross negligence for the same reasons that it is not liable for a claim of negligence.

c.  The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that the facts, evidence, and law presented in this arbitration do not support this cause of action offered by Claimant for the recovery of damages by him from any of the Respondents.

Claimant also requests an Award of one or more, at his election, of: (i) rescission of the SPLA and the return of $1,800,000; (ii) actual damages of $1,800,000 plus contract interest specified in the SPLA; (iii) a finding of fraud and/or breach of fiduciary by Respondent Sepiachvili; (iv) exemplary and punitive damages;  and (v) attorneys' fees and costs.


## V.    AFFIRMATIVE DEFENSES

The Parties have asserted the affirmative defenses as follows:

**Claimant's Affirmative Defenses**

1.  **Doctrine of Unclean Hands and Illegality**

    a.  Claimant asserts that Respondents are barred from asserting a settlement in the "Settlement Documents," or from disputing reliance by Claimant on the Unclean Hands Doctrine by Claimant, because the Unclean Hands Doctrine applies to the fraud of Respondents.

    b.  Respondents assert that the Unclean Hands Doctrine applies to the applicable claims and defenses of Claimant.

    c.  The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that: (i) Respondents' fraudulent conduct, participation in breach of contract, participation in breach of fiduciary duty, and resulting "unclean hands" herein described disallow Respondents from asserting applicable claims and

defenses; and (ii) except to the extent specifically cited by the Arbitrator in any

part of this Award, the Doctrines of Unclean Hands and Illegality are not

supported by the facts, evidence, and law presented in this arbitration for any

relief, findings, or conclusions of law.

**Respondents' Affirmative Defenses**

1. **Accord and Satisfaction**

    a. Respondents assert that Claimant offered the Settlement Documents as an accord
    that resolved the Parties' dispute when Respondent signed and returned them to
    Claimant with the Lease.

    b. Claimant asserts that: (i) Claimant did not sign or return the Settlement
    Documents to Respondent Aterra as required by Section 9.8 of the SPLA; and (ii)
    Respondent Aterra committed fraud and is barred from asserting a settlement by
    the Unclean Hands Doctrine.

    c. The Arbitrator, among other findings and conclusions stated in this Award, finds
    and concludes that: (i) the Unclean Hands Doctrine precludes Respondents from
    asserting the defense of Accord and Satisfaction based on the delivery by
    Respondent Aterra of the "Settlement Documents" signed and delivered to
    Claimant; and (ii) Claimant's assertions are substantially correct.

2. **Failure to Mitigate Damages**

    a. Respondents assert that: (i) Claimant owned the Lease from the "Settlement
    Documents" and owed a duty to mitigate the damages by selling or developing
    the Lease to reduce his damages; (ii) the Lease was worth a minimum of $1,500

per acre, and (iii) Respondents are entitled to an offset against damages, if any, owed by them to Claimant.

b.  Claimant asserts that: (i) Section 9.8 m of the SPLA requires any amendments or waivers be in writing and signed by all parties; and (ii) the "Settlement Documents" were not signed by Claimant.

c.  The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that: (i) Respondents' fraudulent conduct, participation in breach of contract, participation in breach of fiduciary duty, and resulting "unclean hands" herein described disallow Respondents from asserting the affirmative defense of Failure to Mitigate Damages; and (ii) the Claimant's assertions are substantially correct.

3.  **Unclean Hands and Illegality**

a.  Respondents assert that: (i) Claimant drafted the SPLA, insisted on structuring it as a loan to obtain more favorable tax treatment in Russia, and now urges that the SPLA is a joint venture agreement and securities transaction; and (ii) these inconsistent positions leave Claimant barred by unclean hands and illegality from taking the position that the SPLA is a joint venture.

b.  Claimant asserts that Respondents cannot rely on a defense of "unclean hands" against Claimant when Respondents have "unclean hands" by participating in contract breach, fraud, and other violations of law.

c.  The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that: (i) Claimant's assertions are substantially correct; and (ii) the

facts, evidence, and law presented in this arbitration do not support the

Affirmative Defense offered by Respondents.

Respondents assert, among others, the defenses of accord and satisfaction, estoppel, release, waiver, failure to mitigate damages, and unclean hands/illegality in Respondents' Answer and Counterclaim, along with the Counterclaims as follows:

## VI.   RESPONDENTS' COUNTERCLAIMS

Respondents assert the following counterclaims in Respondents' Answer and Counterclaim, and the Arbitrator rules on them, as follows:

1. **Breach of Contract-Breach of SPLA.**

   a.   Respondents assert that Claimant breached the SPLA by filing a federal action rather than initiating mediation/arbitration as required under its Sections 8.1 and 8.2**.**

   b.   Claimant asserts that: (i) Respondent Aterra is the only Respondent which was a party to the SPLA and the federal action; therefore, if any award is made for this counterclaim, then Claimant would be obligated to pay only 1/12 of the award; and (ii) the doctrine of unclean hands applicable for Respondents fraud and breach of contract would preclude such payment.

   c.   The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that: (i) Claimant breached the mediation and arbitration provisions of Article VIII, Conflict Resolution, of the SPLA by filing a federal lawsuit instead of filing the case with the AAA; and (ii) Respondents' damages for such breach of Article VIII are $96,512 in attorneys' fees for their two law firms.

2. **Breach of Contract-Breach of Arbitration Agreement.**

   a. Respondents assert that: (i) Claimant breached the Arbitration Agreement (Exhibit R—80) between them by asserting claims regarding the Austin Chalk project in this arbitration; and (ii) for such breach, Respondents are entitled to recover their related attorneys' fees.

   b. Claimant asserts that the doctrine of "unclean hands" prevents the recovery sought by Respondents.

   c. The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that: (i) Respondents' assertions are substantially correct; and (ii) no damages have been separately shown.

3. **Fraud in the Inducement-Induced into Signing Settlement Documents.**

   a. Respondents assert that: (i) Claimant fraudulently induced Respondent Aterra to relinquish the Lease by Claimant's lawyer persuading Respondent Aterra to sign and forward to Claimant the "Settlement Documents," but then Claimant refused to sign them; and (ii) this denied Respondent Aterra the further opportunity to sell the Lease for a profit in excess of $500,000 to "a willing Buyer" brought by its lease contractor, Danny Davis; and (ii) Respondent Aterra is entitled to damages of at least $500,000.

   b. Claimant asserts that: (i) the Settlement Documents were not signed, amended, or waived by Claimant as required by Section 9.8 of the SPLA; (ii) therefore, the Settlement Documents have no effect; (iii) the Unclean Hands Doctrine prevents the recovery sought by Respondent Aterra; and (iv) Respondent Aterra failed to mitigate damages by extending the Lease for two years.

c.   The Arbitrator, among other findings and conclusions stated in this Award, finds and concludes that: (i) the facts, evidence, and law presented in this arbitration do not support this cause of action offered by Respondent Aterra for the recovery of damages by it from the Claimant; and (ii) Claimant's assertions are substantially correct.

Respondents also request an Award that Claimant take nothing and that Respondents recover attorney's fees, costs, actual and special damages, and exemplary damages.

**Based on the foregoing findings, conclusions, and rulings, I, the Undersigned Arbitrator, award:**

1.   Claimant is awarded damages, and Respondents, other than Level One Advisors, Inc., are jointly and severally liable to Claimant for the amount of US$1,800,000.00 representing the awarded damages for Claimant's causes of action based on breach of contract, fraud, and breach of fiduciary duty.

2.   Claimant request for an award of attorney's fees is granted. Respondents, other than Level One Advisors, Inc., are jointly and severally liable to Claimant for the total fees amount of US$35,000.00.

3.   Claimant is awarded a post-judgement interest effective from and after June 1, 2020 at four percent (4%) per annum, not compounded, until paid

4.   Respondents are awarded damages, and the Claimant is liable to Respondent for US$96,512.00 representing the awarded damages for their Counterclaims for their attorneys' fees in the Federal Action.

5. After a set off of the awarded sums, all Respondents, except for Respondent Level One Advisors, Inc., which has no liability under applicable causes of action stated in Claimant's Statement of Claims, are jointly and severally liable and shall pay to Claimant, the principal sum of damages of US$1,738,488 within 30 days from the transmittal of the Final Award to the parties. The awarded post-judgment interest shall apply to the unpaid part of this amount until paid.

6. The administrative fees of the International Centre for Dispute Resolution ("ICDR"), a division of the AAA, totaling US$31,850.00 and the compensation and expenses of the Arbitrator totaling US$50,886.00 shall be borne by Respondents, other than Level One Advisors, Inc., jointly and severally. Therefore, within 30 days from the transmittal of the Final Award to the parties, these Respondents shall jointly and severally reimburse Claimant the sum of US$44,418.00, representing that portion of said fees, compensation, and expenses in excess of the apportioned costs previously incurred by Claimant.

7. This Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All relief sought in this arbitration which is not specifically granted is hereby denied.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on Recognition and Enforcement of Foreign Arbitral Awards, the Final Award was made in San Antonio, Texas, USA, as of the date hereof.

_____
Richard C. Alsup, Arbitrator

STATE OF TEXAS

COUNTY OF MONTGOMERY

I, Richard C. Alsup, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

March 25, 2020 _____          _____
Date                                          Richard C. Alsup, Arbitrator